IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

———————————

In Re:

AIRADIGM COMMUNICATIONS, INC.,

———————————

FEDERAL COMMUNICATIONS COMMISSION,

|  |  |
|---|---|
| Appellant/Appellee, | OPINION AND ORDER |
|  | 07-cv-616-bbc |
|  | 07-cv-617-bbc |
| v. | 07-cv-660-bbc |
|  | 08-cv-152-bbc |

TELEPHONE AND DATA SYSTEMS, INC.,

Appellee/Appellant.

———————————

These are four appeals from three final orders of the bankruptcy court on the allowability of claims 14, 15, and 16 filed by Telephone and Data Systems., Inc. (TDS) against the Airadigm Communications, Inc. bankruptcy estate.  The bankruptcy court allowed claim 14 in full, disallowed claim 15 in full, and allowed the principal portion of claim 16, but disallowed interest on that claim.  The Federal Communications Commission now appeals the allowance of claims 14 and 16 and TDS appeals the disallowance of claim 15 and the interest portion of claim 16.  This court has jurisdiction over the appeals under

1

28 U.S.C. § 158(a)(1).  I affirm the bankruptcy court's orders on claims 14 and 16 and reverse the bankruptcy court's disallowance of the principal portion of claim 15.

The following summary of relevant undisputed facts and proceedings is drawn from the record of the proceedings before the bankruptcy court.

FACTS

In 1997 debtor was the successful bidder on 15 licenses auctioned by the Federal Communications Commission, permitting it to provide wireless communication services. At the time, debtor's shareholders were Oneida Enterprise Development Authority (Oneida) and Wisconsin Wireless Communications Corporation.   Debtor made a down payment to the FCC and agreed to pay future installments on the balance due.  The FCC retained security interests in the licenses.  Debtor defaulted on its obligations to the FCC and other creditors.

In 1999 debtor filed a chapter 11 bankruptcy petition in the Western District of Wisconsin.  The FCC took the position that, pursuant to FCC rules, the licenses were cancelled automatically as a result of the bankruptcy filing.  Debtor petitioned the FCC to waive the automatic cancellation or reinstate the licenses.

TDS emerged as the primary funding source for the debtor's reorganization.  In 2000, the bankruptcy court confirmed debtor's proposed reorganization plan over the FCC's

opposition, but with the approval of the other major pre-petition creditors.  At the time the 2000 plan was confirmed, the value of the licenses was great enough that if the licenses were included in the estate, all creditors would be paid in full.  Therefore, the plan provided for two alternatives.  The primary plan, which would apply if licenses were reinstated by the FCC, provided for full payment of most claims.  The alternate plan, which would apply if the FCC did not reinstate the licenses, was a liquidation of non-license assets that provided for little or no recovery for major creditors.

The 2000 plan included the following provisions affecting TDS's rights and obligations: (1) TDS (the primary buyer) agreed to make confirmation, working capital and construction loans to the debtor; these would accrue interest and be secured by a lien on the debtor's assets, Collective Plan of Reorganization, Art. VI;  (2) TDS was "obligated to accept a surrender of the collateral [securing the loans] in full and complete satisfaction of" the confirmation and construction loans, id., §§ 6.3, 6.8; (3) TDS agreed to make additional reinstatement loans to debtor if the licenses were reinstated by February 2001, id., § 6.4;(4) if the FCC did not reinstate the licenses by February 2001, but did so by June 30, 2002, TDS had the option to make the reinstatement loans, id., § 10.4;  (5) if reinstatement was completed, TDS would acquire all of debtor's assets for a purchase price based on the number of licenses reinstated, id. §§ 6.10, 6.12; (6) if the FCC "either denie[d] reinstatement of all Licences, or fail[ed] to act on the Petitions for Reinstatement in a timely

3

manner," an alternate plan was to be instituted whereby TDS acquired all of debtor's assets except the licenses in exchange for cancellation of the confirmation loan and TDS's assumption of post confirmation liabilities, id., Art. X; (7) in addition, if the licenses were not reinstated, TDS was obligated to pay Oneida "$2 million in full satisfaction of its secured Claims." Id., § 10.7.

The debtor's three principal pre-petition creditors were the FCC, Ericsson, Inc. (an equipment provider), and Oneida. The plan assumed reinstatement of the licenses and treated the creditors' claims as follows:

5.1 Class 1A (FCC).  Class 1A Claims are impaired.  On the Reinstatement Payment Date, all Allowed Claims of the FCC relating to the Reinstated Licenses shall be paid in full . . . the Buyers will cure any defaults and assume the obligations to the FCC relating to the Reinstated Licenses, and will pay those obligations according to their terms.

5.2 Class 2 (Ericsson).  Class 2 claims are impaired.  The Allowed Class 2 Claims of Ericsson shall be allowed in the amount of $71,000,000.00.  The Allowed Class 2 Claims of Ericsson shall be paid to Ericsson as follows:

(a)     On the Initial Payment Date, Ericsson shall receive a payment of $30 million (the "Ericsson Collateral Payment").  In consideration for and upon receipt of the Ericsson Collateral Payment, Ericsson shall release its Liens on all of the Debtor's Unlicensed Assets. . . .

(b)     Provided that the FCC grants reinstatement of at least the Minimum Licenses, on the Reinstatement Date, Ericsson shall receive a payment of $41 million, in full discharge and satisfaction of the unpaid balances of its Allowed Class 2 Claims.  In consideration for and upon receipt of the payment described in the preceding sentence, Ericsson shall release its Liens on the Licenses and the proceeds thereof. . . . If Ericsson fails to receive

4

payment with respect to any of the Reinstated Licenses, Ericsson shall retain its Liens on such Reinstated Licenses and the proceeds thereof to secure payment of the unpaid portion of Ericsson's Allowed Class 2 Claims. Ericsson shall retain its Lien on any Licenses that are terminated and not reinstated and the related proceeds thereof.

5.3 Class 3 [Oneida] Class 3 Claims are impaired. Provided that the FCC grants reinstatement of at least the Minimum Licenses, on the Reinstatement Date, the Debtor shall pay $49 million in full satisfaction of [Oneida's] prepetition Claims. In the event that fewer than the Minimum Licenses are reinstated, the amount payable to [Oneida] on account of its Allowed Class 3 Claim shall be reduced pursuant to Section 6.12.

TDS made the confirmation, working capital and construction loans to debtor in accordance with the 2000 plan. The proceeds were used to pay other creditors, provide ongoing working capital and finance the acquisition of new cell sites. Ericsson received a $31 million payment on its claim, in accordance with § 5.2 of the 2000 plan. The FCC did not act on the reinstatement petition by June 2002, thus entitling TDS to acquire the non-license assets in accordance with the alternate plan. Beginning on November 14, 2002, TDS and debtor entered into a series of forbearance agreements whereby TDS deferred acquisition of the non-license assets and debtor remained in possession of the assets and continued to operate.

On January 27, 2003, the United States Supreme Court decided <u>Federal Communications Commission v. Nextwave Personal Communications, Inc.</u>, 537 U.S. 293, invalidating the FCC's automatic license cancellation rule. On August 8, 2003, the FCC

denied debtor's petition for reinstatement as moot on the ground that under <u>Nextwave</u>, the licenses had never been cancelled.

On April 21, 2004, TDS filed a notice of assignment of the Ericsson claim to itself. The bankruptcy court approved the assignment, substituting TDS for Ericsson as claimant without affecting the merits of the claim.  Among the assets assigned by Ericsson to TDS were certain obligations from Oneida to Ericsson.

In early 2004, Oneida demanded $2,000,000 from TDS in accordance with the non-reinstatement alternative under the 2000 plan.   TDS denied the payment was due and asserted certain claims against Oneida that it had acquired from Ericsson.  On June 22, 2004, TDS filed a declaratory judgment action in the United States District Court for the Eastern District of Wisconsin, seeking declaration of the parties' rights.  On July 8, 2004, the parties settled the dispute, entering a written settlement agreement and mutual release that was signed not only by Oneida and TDS, but also by the FCC and debtor.  Under the terms of the settlement agreement, TDS agreed to pay Oneida $2,000,000 and Oneida "convey[ed], assign[ed] and transfer[ed] to TDS any and all rights and claims [Oneida] may have, whether present, future or contingent, as a secured or unsecured creditor of Airadigm." Settlement Agreement and Mutual Release, ¶¶ 1, 2.  The settlement agreement provided further that the parties "understood and agreed that the Release is the compromise of one or more doubtful and disputed claims, and the consideration received is not to be construed

6

as an admission of liability on the part of the parties hereby released, and that said releasees deny liability therefor and intend merely to avoid litigation and buy their peace." ¶ 2.  On August 4, 2004, the bankruptcy court substituted TDS for Oneida as holder of the Oneida claim.

On May 8, 2006, debtor filed a second chapter 11 bankruptcy petition in the Bankruptcy Court for the Western District of Wisconsin.  On the same day, TDS filed a motion for a decree that the 2000 Plan had been substantially consummated.  The FCC objected to the decree and the filing of a new chapter 11 case, arguing that at a minimum consummation required satisfaction of the FCC's allowed claim and the transfer of non-license assets.  Alternatively, the FCC contended that rather than declaring the plan consummated and adopting a new plan, the "parties should determine what mutually acceptable modifications or corrections would fulfill the [2000] Plan's purpose."

On June 6, 2006, the parties entered into a stipulation, settling the dispute and paving the way to proceed with the 2006 bankruptcy.  The stipulation provided in part:

1. Except as otherwise specifically set forth in this Stipulation, all of the rights of Airadigm as debtor, and the FCC and TDS as creditors, under the 2000 Plan, including their respective rights as holders of the Allowed Claims they hold pursuant to the 2000 Plan (including the rights of TDS as assignee of certain Allowed Claims), are in no way prejudiced by closing the 1999 Bankruptcy Case and proceeding with the 2006 Bankruptcy Case.

2. The FCC's Allowed Claim in the 1999 Bankruptcy Case shall be allowed in the 2006 Bankruptcy Case.  The claims of TDS as assignee of the Allowed

7

claims of Ericsson, Inc. and Oneida Enterprise Development Authority in the 1999 Bankruptcy Case shall be allowed in the 2006 Bankruptcy Case.  In addition, the claims of TDS arising from its advances of funds in accordance with the 2000 plan shall be allowed in the 2006 Bankruptcy Case in the amount of such loans with interest to the extent provided in the 2000 Plan.

3.  In reliance on these stipulations, (a) the FCC does not object to the closing of the 1999 Bankruptcy Case and will withdraw its objection to the motion . . . .

4.  All other rights of the parties hereto (including, without limitation, the right of the FCC and TDS to seek the inclusion and allowance of interest on their Allowed Claims (including assigned Allowed Claims) in the 2006 Bankruptcy Case) are expressly reserved.

At the hearing on the application for final decree in the 1999 bankruptcy, counsel

made the following comments, among others:

MS. FURAY (for TDS):

> . . . The parties have reached an agreement and stipulation with respect to the objection of the Federal Communications Commission. . . .  The stipulation resolves the objection, and the parties would like to place on the record a clarification as to their understanding of some of the terms and provisions of the stipulation. . . .
>
> The parties would like to note for the record that with respect to that, it is the intention of the parties to agree that the claims in the amounts allowed in the 2000 case— the amounts are not in dispute as allowed in the 2000 case.  However, as noted in the stipulation, there is an unresolved issue as to the right to claim interest accrued on those claims since their allowance. And there are also, as not referenced in the stipulation, open

8

questions with respect to the nature or extent of security for various claims.

      As to those two unresolved issues and other unresolved issues, the parties do not intend by this stipulation to waive a right as might be appropriate or as might be authorized under the code or the rules to pursue disputes, should they so choose in the future.

\* \* \*

THE COURT:

      . . . You all want to redraft the stipulation? This isn't a matter of great time pressure, as far as I know, if you all want to go back and put what you really mean to your stipulation and sign it again, you're welcome to.

MR. BARLIANT (for the debtor):

      Your Honor, I think Paragraph 4 is broad.  It reserves all rights.  We just want to be clear it includes the rights of security interests, protection of security interests and value of secured claims.   I believe the FCC has acknowledged that's encompassed in Paragraph 4 of the stipulation.

MS. DeFALISE (for the FCC):

      We would just like to clarify that by withdrawing our objection, that does not speak to any of the substantive arguments that were put into the motion—I'm sorry, the application to dismiss or in any way is conceding to the arguments that were made by Airadigm in their response and position of statement.

THE COURT:

      . . . the foregoing stipulation is approved.  I probably should put in as modified on the record . . .

Transcript of June 6, 2006 hrg. at 2-6.  Before approving the stipulation, Judge Martin deleted the portion of the signature line indicating that he was entering an order with respect to the stipulation.

On June 12, 2006, the bankruptcy court determined that the 2000 plan had been substantially consummated and ordered the 1999 estate closed.

On June 13, 2006, debtor filed an amended plan of reorganization.  On October 31, 2006, the bankruptcy court confirmed the 2006 plan over the objections of the FCC.  Under the terms of the 2006 plan, the FCC is to be paid in cash the secured amount of its claims as determined by the bankruptcy court.  Upon such payment the FCC's liens are released.  Alternatively, if the FCC exercises its right under 11 U.S.C. § 1111(b), it will retain its lien and be paid proceeds of U.S. Treasury securities or "A" rated insurance annuity contracts purchased with the cash equivalent of the licenses' value as determined by the bankruptcy court so that over 30 years, the FCC will receive deferred cash payments totaling the full amount of its claim, equal to the value of the licenses as of the effective date.  TDS is to be paid in full for its secured claim over eight years.  Unsecured claims are satisfied by the issuance of one share of common stock for each $500,000 allowed.

The FCC filed a $64.2 million claim against the estate.  On June 30, 2006 debtor began an adversary proceeding to determine the validity, priority or extent of the FCC liens on the licenses.  Debtor argued that the FCC liens had been extinguished by the 2000 plan.

10

The bankruptcy court allowed the FCC's claim, finding that the FCC's liens on the licenses survived the 1999 bankruptcy and that the licenses had a value of $33 million. The bankruptcy court bifurcated the claim between its secured and unsecured portions in accordance with 11 U.S.C. § 506(a). The bankruptcy court, the district court and the court of appeals agreed that the FCC liens had not been extinguished by the 2000 plan. Specifically, because all parties to the plan had assumed incorrectly that the licenses had been cancelled, the 2000 plan did not deal with the liens and they passed through the bankruptcy unaffected. In re Airadigm Communications, Inc., 519 F.3d 640, 649 (7th Cir. 2008).

TDS filed claim 14 for the principal amounts of the 2000 plan confirmation, working capital and construction loans, plus interest accrued by the 2006 petition date. The FCC argued that the claim should be limited to the value of the securing collateral, contested the amount of the advances and challenged the interest computation. TDS moved for summary judgment on the claim, which the bankruptcy court granted on May 11, 2007, allowing claim 14 as filed. The bankruptcy court found that TDS had made the three loans as claimed; TDS was not a shareholder of debtor; and the interest was correctly calculated. On June 22, 2007, the FCC filed a second motion, seeking denial or reduction of claim 14 on the ground that the claim should be recharacterized as an equity interest. The bankruptcy court denied the motion on July 30, 2007, refusing to recharacterize TDS's debt as equity

11

and expressing doubt that recharacterization of an interest was ever an available option under the bankruptcy code.  The court allowed the claim as filed in the amount of $80,416,499.20, but "reserved the determination of the value of collateral securing Claim No. 14 for trial."  On September 23, 2007, TDS and the FCC stipulated that the value of the non-license assets was $15 million and on September 24, 2007, the bankruptcy court approved the stipulation and entered an order valuing the collateral for claim 14 in the amount agreed to by the FCC and TDS.

TDS then filed claim 16 based on the claim assigned it by Ericsson, asserting a right to $41,000,000 in principal and $13,589,475.85 in interest.  The FCC objected to the claim and the parties filed cross motions for summary judgment.   At a July 12, 2007 hearing on the matter, the bankruptcy judge stated that he would allow the principal amount of the claim but not the interest, because he found no provision in the 2000 plan that would allow for interest on the claim.   On July 30, 2007, he entered an order to that effect, allowing the claim in the amount of $41,000,000, determining that the secured portion of the claim was $489,646.99 and disallowing any pre-petition interest.

TDS filed claim 15 based on the claim assigned from Oneida in the principal amount of $40,000,000 and interest in the amount of $13,258,025.21.  The FCC objected to the claim in its entirety; debtor objected to the interest portion of the claim.  On September 25, 2007, the bankruptcy court held a trial on the contested claim at which TDS submitted

12

evidence that the principal amount of the claim was $49,000,000. On January 18, 2008, it denied claim 15, holding that the parties were bound by the literal terms of the 2000 plan, notwithstanding their misapprehension concerning the ownership of the licenses:

> TDS and [Oneida] believed in 2004 that Claim 15 was subject to the back-up treatment. They behaved in 2004 as if Claim 15 was subject to the back-up treatment. It seems clear that TDS and [Oneida] intended the words of the 2000 Plan—including the strict time limits—to control. The only holding consistent with that intention is that once the back-up transfer date was passed, [Oneida] was entitled to no more than $2,000,000.

Jan. 18, 2008 Mem. Decision, dkt. #600, at 6.


OPINION

The FCC appeals the orders of the bankruptcy court allowing claims 14 and 16. TDS appeals the final order disallowing claim 15 and the denial of interest on claim 16. This court evaluates de novo the legal issues resolved by the bankruptcy court in its final orders. Mungo v. Taylor, 355 F.3d 969, 974 (7th Cir. 2004). Findings of fact are accepted unless clearly erroneous. Id.


A. Claim 14

The FCC's primary contention is that the bankruptcy court erred when it refused to hold that TDS's interest arising from the 2000 plan loans is properly characterized as an

13

equity interest and should be treated as such.  The FCC contends that neither TDS nor debtor intended the loans from TDS to debtor to be repaid; in such a situation, TDS should be treated as a purchaser of equity and not a lender.

I concur generally with Judge Martin's thoughtful analysis of the law of claim "recharacterization" in bankruptcy, In re Airadigm Communications, Inc., 376 B.R. 903, 908-916 (2007), and particularly with his conclusion that any attempt to "recharacterize" a claim, which is, after all,  nothing  more than "a right to payment," 11 U.S.C. § 101(5), must find its support in the bankruptcy code.  The bankruptcy court's conclusion rested on its belief that bankruptcy courts "must and can only" exercise their powers "within the confines of the Bankruptcy Code." Norwest Bank Washington v. Ahlers, 485 U.S. 197, 206 (1988).  In the bankruptcy court's view, only two provisions of the code would permit a change in the status of a claim:  § 503(b) and § 502(j), and neither of these applied to the situation before the court.

Section 502(b) governs the allowance and disallowance of claims.  It provides in relevant part:

> if [an] objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount . . . .

14

Analyzing § 502(b), the bankruptcy court noted that the statute could support a change in the parties' classification of the financing agreement if the parties could show that the amount of any particular "claim" was zero.  In that case, no part of the creditor's proof of claim would constitute a right to payment.  So, for example, if a common shareholder mistakenly filed a proof of claim, the claim would be disallowed under § 502(b) because a shareholder's interest is not a "right to payment" under the statute's definition of a claim. In re Airadigm Communications, Inc., 376 B.R. at 910.

Although I agree with the bankruptcy court that recharacterization should not be untethered from the provisions of the code, I would not agree that recharacterization is improper if accomplished within the code's confines.  The court's example of a mistaken shareholder necessitates a recharacterization of a "claim," or at the very least, a determination that no actual claim ever existed.  Moreover, it is well recognized that the substance of a transaction rather than the name attached to it by the parties controls its legal effect, In re United Air Lines, Inc., 447 F.3d 504, 506 (7th Cir. 2006).  It is possible that an interest represented in a proof of claim to be a right to payment is in fact an equity interest subject to disallowance.

Courts invoking recharacterization analysis have typically applied various multi-factor tests borrowed from non-bankruptcy cases.  In re SubMicron Systems Corp. 432 F.3d 448, 455 (3d Cir. 2006) (collecting various tests applied by bankruptcy courts).  However, the

15

multi-factor tests are nothing more than tools to get at a broader concern that parties can unfairly manipulate legal rights by misnaming a transaction.   In the tax setting, recharacerization has been invoked to prevent taxpayers from evading taxes by mislabeling taxable transactions.   In the bankruptcy context, courts have suggested that recharacterization might be necessary to prevent controlling stakeholders in a corporation from mischaracterizing an equity contribution as a loan in order to improve their right to recover in bankruptcy to the unfair disadvantage of outside creditors.   In re Hedged-Investments Associates, Inc., 380 F.3d 1292, 1298 (10th Cir. 2004).   In either case, the point of the multi-factor tests is to discern whether the parties called an instrument one thing, when in fact they intended it to be something else.   The intent may be inferred from what the parties say in their contracts, from what they do in their actions, and from the economic reality of the transaction.   Submicron, 432 F.3d at 456.

In its defense to the FCC's challenge to the nature of the transaction, TDS contends first that res judicata (claim preclusion) arises from the FCC's participation in the 2000 plan confirmation process and legally precludes the FCC from contesting the nature of TDS's interest.   As a general matter, claim preclusion applies to bankruptcy proceeding and acts to bar not only those matters litigated, but also matters that could have been resolved in the prior proceeding.   Crop-Maker Soil Services, Inc. v. Fairmount State Bank, 881 F.2d 436, 438 (7th Cir. 1989).   However, it would not apply here because the FCC could not have

16

challenged the characterization of a hypothetical claim by TDS in a possible future bankruptcy during the confirmation process of the 2000 plan.  When the 2000 plan was confirmed, TDS had not yet made the loan, much less filed a claim as a creditor.  At that point, the FCC would have had no reason to raise its challenge to the nature of TDS's interest and the bankruptcy court would have had no reason to consider the question.

Although the FCC's challenge is not foreclosed as a matter of law, it is foreclosed as a practical matter by the nature of plan confirmation and the facts surrounding the confirmation of the 2000 plan.  The parties to that plan included the FCC and all of debtor's other stakeholders, all of whom intended TDS's funding of the reorganization to take the form of loans and to be treated as loans in bankruptcy.  At the time the plan was negotiated, TDS had no stake in debtor.  It was willing to fund the reorganization because it was hopeful that the FCC would promptly reinstate the licenses, rendering the debtor both solvent and viable.  The signatories to the plan structured and documented the funding in all respects and in great detail as three non-recourse secured loans. making it indisputable that the plan created a right to payment within the meaning of § 101(5) in the form of delivery of the securing assets.

All the creditors, including the FCC, were aware of the characterization as a loan.  As a sophisticated party with capable representation in the bankruptcy proceedings, the FCC would have understood the priority implications of characterizing the contributions as loans

17

rather than equity in potential subsequent proceedings, yet it made no objection to the characterization during plan confirmation.  Presumably, it knew that TDS would fund the reorganization only if its funding took the form of loans.  The record discloses no possibility of manipulation or unfair disadvantage to other creditors.  In fact, the majority of other creditors had their debts satisfied with the loan proceeds.  Given the context of TDS's loans to the debtor, no one could say that TDS disguised the true nature of its funding of debtor and thereby triggered concerns that would make recharacterization appropriate.

Lending further support to the bankruptcy court's analysis and conclusion that recharacterization is unwarranted is TDS's status at the time as a corporate outsider and its behavior, which was consistent with that of a secured lender, not a shareholder.   In re Airadigm Communications, Inc., 376 B.R. at 915.  TDS's subsequent activities, including its acquisition of the Oneida and Ericsson claims, do not change the nature of the loan transaction consummated under the 2000 plan.  By itself, a corporate lender's acquisition of an interest in a corporation does not change an earlier loan transaction with that corporation into an equity investment.

The nature of confirmed chapter 11 plans provides another reason not to recharacterize a funding loan made pursuant to such a plan.  In chapter 11 proceedings, any loan transaction is a public record; it is evaluated and approved by the bankruptcy court; and it has survived the scrutiny of affected creditors.  In other words, it affords no opportunity

18

for the sort of unilateral mischaraterization the doctrine of recharacterization seeks to correct.   Under circumstances in which all parties involved in the ultimate dispute participated in the initial classification, it is entirely fair to bind those parties by the characterization set forth in the plan.   From a policy perspective, the possibility that a creditor funding a chapter 11 plan could have its repayment right recharacterized from debt to equity would seriously undermine the ability of debtors to reorganize under chapter 11.   Certainly, treating the TDS plan funding as a loan did not disadvantage the pre-existing creditors and if it had, they were in a position to object to the plan terms.

Finally, whatever the effect of the 2006 stipulation negotiated by the FCC, the document left no doubt that all parties continued to view the transactions as a loan:  they agreed that "the claims of TDS arising from its advances of funds in accordance with the 2000 plan shall be allowed in the 2006 Bankruptcy Case in the amount of such loans with interest to the extent provided in the 2000 Plan." Although the parties may have limited the stipulation somewhat ambiguously by their oral remarks at the hearing, they left little doubt that the stipulation reflected the parties' continuous intent to treat TDS's advances as loans subject to becoming claims in bankruptcy.  It would be odd indeed if the parties stipulated that *claims* arising from the *loans we*re to be *allowed,* while reserving their right to argue to the contrary that the advances were neither claims nor loans and should be fully disallowed.

19

From the time of the drafting and confirmation of the 2000 plan to the filing of the 2006 plan, the affected parties fully understood and intended that TDS's advances would be treated as loans.  The bankruptcy court was correct to conclude as a matter of law that TDS's funding of the 2000 plan constituted loans that could not be recharacterized as an equity investment and that claim 14 could not be disallowed on that basis.

Alternatively, the FCC contends that, if claim 14 is to be allowed, it must be limited to the value of the securing assets because the assets were all that TDS could have expected to receive under the 2000 plan.  The FCC provides no support for this novel approach to claim valuation and I am aware of none.  The TDS 2000 plan loans were non-recourse loans.  They were an advance of funds, fully documented as loans, permitting TDS to look only to the collateral for repayment.  The basic nature of the transaction as a secured non-recourse loan does not change because the parties contemplated from the outset that the loans would be satisfied by a turnover of the security.  The law is clear that such loans give rise to a claim in bankruptcy for the full amount of the debt, regardless of the debtor's lack of personal liability or the inadequacy of the collateral.   § 102(2) ("claim against the debtor" includes claim against property of debtor); <u>Johnson v. Home State Bank</u>, 501 U.S. 78, 87 (1991) ("Congress' intent [is that] § 102(2) extends to all interests having the relevant attributes of non-recourse obligations regardless of how these obligations come into existence.")

Additionally, § 1111(b)(1)(A) provides that "a claim secured by a lien on property of the estate shall be allowed or disallowed under section 502 of this title the same as if the holder of such a claim had recourse against the debtor on account of such claim, whether or not such holder has such recourse. . . ."  Thus, the code directly contradicts the FCC's position that TDS's nonrecourse, undersecured claim should be limited to the value of the collateral.

In an effort to circumvent the unambiguous language of the code, the FCC argues that TDS's claim should be treated differently because, in agreeing to the terms of the 2000 plan, the parties intended that debtor would satisfy the loans solely by transferring title to the collateral.  This is a weak argument; every non-recourse borrower may fully satisfy the creditor's claim by transferring the collateral.  The question is not whether the creditor could have, or even was contractually obligated to satisfy the claim by transferring the collateral, but whether it did so.

When debtor filed the 2006 bankruptcy and the 2006 plan that proposed to retain the non-license assets in the estate and use them in the reorganization, TDS was entitled to claim the full value of the loan in accordance with the bankruptcy code.  In opposing the debtor's motion to declare the 2000 plan substantially consummated, the FCC might have insisted that debtor transfer the non-license assets to TDS in full satisfaction of its claim in

21

accordance with the 2000 plan, thereby limiting its recovery.  Instead, it stipulated that the plan had been consummated notwithstanding the lack of transfer.

The bankruptcy court properly allowed claim 14 in the amount of $80,416,499.20. I turn then to claim 16 and then to claim 15, both of which relate to the allowance of claims assigned to TDS.


## B. Claim 16 (the Ericsson Claim)

The questions presented in this claim is whether the Ericcson claim (assigned to TDS on April 4, 2004) warrants any payment at all and if it does, whether the payment includes interest.  In its appeal, the FCC takes the position that the 2000 plan literally precludes any payment because the licenses were never reinstated; it argues that the plan should be enforced as written.  In its cross appeal, TDS argues that the Ericsson claim was liquidated and secured at the time of the confirmation of the 2000 plan and, therefore, under § 506(b) of the code, TDS is entitled to interest consistent with the treatment afforded the FCC's claim.  Neither party challenges the bankruptcy court's determination of the value of the secured portion of the claim.

The allowance of the Ericsson claim in the 2006 case claim is a matter of determining the value of the claim in the 2000 plan, as it was affected by the stipulation of the parties. Although interpretation of a confirmed plan is similar to interpretation of a contract, a

22

bankruptcy court's interpretation of a plan it confirmed is subject to deference as an interpretation of its own order and may be overturned only if the record shows an abuse of discretion in the interpretation.  Matter of Weber, 25 F.3d 413, 416 (7th Cir. 1994).  The bankruptcy court's interpretation of the stipulation is a different matter; it is not entitled to special deference.  As the hearing transcript made clear, the bankruptcy court entered the stipulation solely on the representation that it was the agreement of the parties, not an order of the court, not on the basis of any assessment of the merits of the stipulation and with the express statement that no judgment as to the meaning was implied.   Accordingly, its meaning is a question of law to be determined de novo from the language of the stipulation and the statements on the record.

The problem with attempting to discern the intent of the parties embodied in the 2000 plan, is that no one anticipated NextWave or its effect.  Had the parties known at the time of the confirmation of the 2000 plan that NextWave would establish that debtor still owned the licenses, they would have treated all claims under the primary plan, that is, the one that would apply if reinstatement occurred.  Under that plan, the estate assets would have been sufficient to pay all secured claims in full and Ericsson would have received $41,000,000 in accordance with a provision similar to ¶ 5.2(b) of the plan.  No doubt, similar treatment would have been afforded the FCC and Oneida on their claims.  Lacking this knowledge, the drafters made no provision for the possibility.  Instead, they assumed

23

that in the absence of license reinstatement by the FCC, the estate included only the non-license assets.  Accordingly, under the literal application of the 2000 plan, the FCC having "fail[ed] to act on the Petition for Reinstatement in a timely manner," the alternate plan applied and all three creditors were entitled to virtually nothing.

Such a result would have been manifestly unfair to the secured creditors, and particularly to the FCC.  As a result of the unanticipated NextWave ruling, debtor would have obtained full use and possession of the licenses without payment.  For this reason, the FCC's initial position was to oppose a final decree in the 1999 case, insisting that either the 2000 plan be modified so that its purpose could be fulfilled or that it be paid in full in accordance with the primary plan.  Against this backdrop the parties negotiated the stipulation, agreeing that the FCC, Ericsson and Oneida claims from the 1999 bankruptcy would be allowed in the 2006 bankruptcy.  The plain intent of the stipulation was to avoid the injustice of allowing debtor to retain the licenses without paying the secured creditors, contrary to the overriding purpose of the 2000 plan.

Agreeing to make full allowance for the claims from the 2000 plan in the 2006 bankruptcy was the parties' effort to retrofit the 2000 plan to account for NextWave, in a manner that would more fairly reflect its original purpose.  Unfortunately, the parties could do nothing to restore the value the licenses had lost during the intervening years.  The dramatic decline in value had implications for the status of the claims as secured or

24

unsecured and the potential availability of interest.  Consistently with this unavoidable change in circumstances, the parties reserved the right to argue about the nature and extent of security and interest associated with the claims.  Notwithstanding the parties' vague references during the approval hearing to reserving the right to argue about "other unresolved issues," no one would conclude that those issues included the right to contest the amount of the claims to be allowed.  Paragraph 4 of the stipulation reserves "all other rights of the parties."  The term "other rights" unmistakably excludes the allowability and amount of the claims set forth in paragraphs 1 and 2.  Otherwise, the stipulation was a nullity.  It would be absurd to construe the comments as leaving the parties free to contest the amount and allowability of claims in view of the critical role the stipulation played in prompting the FCC's abandonment of its objection to closing the 1999 bankruptcy.  Paragraphs 1 and 2 of the stipulation require the allowance of claim 16 in the same amount, $41,000,000, as it was allowed in the 2000 plan; I will affirm the bankruptcy court's allowance of the claim in that amount.

In drafting paragraph 4 of the stipulation, the parties intentionally left open the question whether interest was to be allowed on a claim, so the Ericsson claim includes interest only if the 2000 plan provided for it.  Section 5.2 of the 2000 plan says only that "provided that the FCC grants reinstatement of at least the Minimum Licenses, on the Reinstatement Date, Ericsson shall receive a payment of $41 million."  The plan makes no

25

mention of any entitlement to interest; without that, no basis exists on which to award interest on the claim.

TDS protests that this result is unfair because the FCC was awarded interest on its claim, even though it was similarly situated to TDS. A careful comparison of the two claims, reveals that they are dissimilar in important respects. The differences provide ample support for the bankruptcy court's conclusion that the 2000 plan provided for the payment of interest on the FCC's claim, but not on Ericsson's claim. The most prominent difference is that Ericsson voted for the 2000 plan while the FCC opposed it, thereby entitling itself to cramdown rights, including the right to interest on its oversecured claim, in accordance with § 1129(b)(2)(A). Ericsson had no such entitlement. Second, unlike § 5.2, which applies to Ericsson, § 5.1 provided generally that the FCC would be paid "all claims relating to the licenses" or that TDS would "cure any defaults and assume the obligations" of the licenses. In addition, debtor assured the bankruptcy court at the confirmation hearing for the 2000 plan that reinstatement would entitle the FCC to "be paid in full with interest." In re Airadigm, No. 07-C-307-S, Sept. 28, 2007 Mem. and Order of Judge Shabaz (discussing relevant facts in greater detail and affirming bankruptcy court's award of interest to FCC). In light of the language of the plan and the circumstances surrounding its confirmation, the bankruptcy court's conclusion that the 2000 plan entitled the FCC to interest on its claim

was not only reasonable, it was compelled.  No similar arguments can be made in support of Ericsson's claim for interest.

TDS also pursues the recovery of interest under § 506(b) of the bankruptcy code, which provides for the payment of post-petition interest on oversecured claims.  TDS notes that the bankruptcy court previously awarded post-1999 petition interest to the FCC under that provision.  Id. at 14.  Again, TDS fails to note the difference between the FCC's refusal to accept the 2000 plan and Ericsson's support for it.  Although § 506(b) triggers a right to interest to the extent claims are oversecured on the petition date, that right is waived by a creditor who consents to the terms of a plan that make no provision for interest.  In re Chappell, 984 F.2d 775, 781 (7th Cir. 1993).  When Ericsson acquiesced in the 2000 plan that provided for a payment of $41,000,000 under the primary plan with no additional interest, it waived any right it might have had to receive interest under the provisions of § 506(b).  That waiver applies equally to the circumstance in which TDS's oversecured position arose by operation of law under NextWave, rather than by FCC reinstatement.

I conclude that the bankruptcy court acted correctly in allowing Ericsson's claim in the amount of $41,000,000 and in disallowing interest on the claim.  Therefore, I will affirm its order on claim 16.

27

C. <u>Claim 15 (the Oneida Claim)</u>

On claim 15, the question is whether the bankruptcy court was correct to disallow the Oneida claim assigned to TDS. TDS contends that it was not. It argues that applying the alternate plan terms of the 2000 plan to find the claim fully satisfied was inconsistent with the bankruptcy court's treatment of the FCC's claim and claim 16 and the parties' stipulation. The FCC maintains that the bankruptcy court properly applied the terms of the alternate plan in denying the Oneida claim entirely, and that the 2004 settlement agreement extinguished the Oneida claim.

The previous analysis of the Ericsson claim, which addresses nearly identical circumstances and arguments, applies equally to the Oneida claim in these respects: (1) the 2000 plan rights, as transferred by the parties' stipulation to the 2006 plan, entitled TDS to an allowed claim in the 2006 bankruptcy equal to Oneida's allowed claim under the 2000 plan ($49,000,000); and (2) TDS is not entitled to interest on the Oneida claim because, unlike the FCC, Oneida accepted the 2000 plan and the plan makes no provision for payment of interest on the claim. In providing that "the Debtor shall pay $49 million in full satisfaction of Oneida's prepetition claims," § 5.3 of the 2000 plan leaves the parties no room to contest either the amount of the allowed claim or the absence of interest.

The only significant factual difference between the Oneida and Ericsson claims is the 2004 litigation and settlement agreement dealing with the Oneida claim. The additional fact

28

raises the question whether the dispute between TDS and Oneida and the resolution of the dispute somehow amounted to full satisfaction of the claim under the alternate plan.  I conclude that it had no such effect.  At the time of the 2004 dispute between Oneida and TDS, the parties were aware that <u>NextWave</u> had changed the circumstances in a way that made the alternate liquidation plan illogical if debtor owned the licenses, as was now the case.  Notwithstanding the literal satisfaction of the triggers for the alternate plan, TDS's acquisition of the non-license assets and the maturation of the loans had been held in abeyance while TDS and debtor were contemplating alternative solutions.  Their efforts ultimately manifested themselves in the stipulation and 2006 plan.  Thus, at the time of the dispute, Oneida was insisting on payment from TDS under the alternate plan, while TDS was contending that the alternate plan had become inapplicable because of <u>NextWave</u>.

The clear intent of the settlement agreement was to avoid addressing or resolving this underlying dispute between TDS and Oneida and instead to eliminate Oneida from the process, leaving TDS in its place to assert the claim. The bankruptcy court erred when it concluded that the settlement was an acknowledgment by TDS, Oneida and the other parties to the settlement that the Oneida claim was being finally settled under the alternate plan.  To the contrary, the parties agreed expressly that the settlement was "the compromise of one or more doubtful and disputed claims, and the consideration received is not to be construed as an admission of liability on the part of the parties hereby released, and that said

29

releasees deny liability therefor and intend merely to avoid litigation and buy their peace."
Settlement Agreement, ¶ 2.  TDS intentionally refused to admit that Oneida was entitled
to payment under the alternate plan and certainly did not admit that it was making such a
payment.  The settlement merely substituted TDS for Oneida on the claim; it made no
change in the legal status of the claim.

Consequently, I will reverse the final order of the bankruptcy court disallowing claim
15 in its entirely and remand the case to the bankruptcy court with the direction to enter
judgment in favor of TDS on the claim in the principal-only amount of $49,000,000.  (As
with the Ericcson claim, the Oneida claim rests on the 2000 plan, which made no provision
for interest.)

ORDER

IT IS ORDERED that the final order of the bankruptcy court on appeal in case no.
07-cv-660-bbc, allowing claim 14 in the amount of $80,416,499.20, is AFFIRMED.

FURTHER, IT IS ORDERED that the final order of the bankruptcy court on appeal
in cases no. 07-cv-616-bbc and 07-cv-617-bbc, allowing claim 16 in the amount of
$41,000,000, is AFFIRMED.

FURTHER, IT IS ORDERED that the final order of the bankruptcy court on appeal
in case no. 08-cv-152-bbc, disallowing claim 15, is REVERSED and this case is remanded

30

to the bankruptcy court to enter judgment for TDS, allowing claim 15 in the amount of $49,000,000.

Entered this 12th day of August, 2008.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge